139 Ariz. 280 (1983)
678 P.2d 465
STATE of Arizona, Appellee,
v.
John OLEA, John Gonzales, John Robles, and Joe Urias, Appellants.
Nos. 1 CA-CR 5911, 1 CA-CR 5915, 1 CA-CR 5916 and 1 CA-CR 5930.
Court of Appeals of Arizona, Division 1, Department C.
October 18, 1983.
Reconsideration Denied December 21, 1983.
Review Denied March 6, 1984.
*283 Robert K. Corbin, Atty. Gen. by William J. Schafer III, Chief Counsel, Crim. Div., Michael D. Jones, Asst. Atty. Gen., Phoenix, for appellee.
Thomas A. Thinnes, P.A. by Thomas A. Thinnes, Douglas La Sota, Phoenix, for appellants.
OPINION
BROOKS, Judge.
Appellants appeal from the judgments and sentences imposed following a submission of their cases to the trial court on stipulated evidence. Appellants were convicted on the following counts: Appellant Gonzales was found guilty of the crime of conspiracy (count 1), 13 counts of offering to furnish a narcotic drug (counts 36-37, 39-42, 44-47, 49-51), two counts of furnishing a narcotic drug (counts 38 and 43), two counts of furnishing a narcotic drug of a value greater than $250 (counts 48 and 52); appellant Olea was found guilty of the crime of conspiracy (count 1), seven counts of offering to furnish a narcotic drug (counts 54-57, 59-61), furnishing a narcotic drug (count 53), and two counts of furnishing a narcotic drug of a value greater than $250 (counts 58 and 62); appellant Robles was found guilty of the crime of conspiracy (count 1), 13 counts of offering to furnish a narcotic drug (counts 2-3, 5-8, 10-13, 15-17), furnishing a narcotic drug (count 4), offering to transport a narcotic drug (count 9), furnishing a narcotic drug of a value greater than $250 (count 14), and transporting a narcotic drug of a value greater than $250 (count 18); appellant Urias was found guilty of the crime of conspiracy (count 1), 13 counts of offering to furnish a narcotic drug (counts 19-20, 22-25, 27-30, 32-34), two counts of furnishing a narcotic drug (counts 21 and 26), and two counts of furnishing a narcotic drug of a value greater than $250 (counts 31 and 35).
These appeals were consolidated on appellants' motions because they raised common issues of fact and law. Appellants, among others, were charged by indictment for acts committed from May through August, 1978. It was alleged that they and their co-defendants conspired during the summer of 1978 to commit the offenses of possessing, transporting, importing, selling, furnishing, and offering to transport and furnish heroin. Appellants were also charged with substantive counts alleged to be a part of the conspiracy.
As a consequence of a police investigation which included the use of undercover police officers, "controlled-buys" of heroin by those officers, informants and surveillances, narcotics officers of the Phoenix Police Department sought a wiretap, pursuant to the statute then in effect, A.R.S. § 13-1057, in order to discover the extent of illegal narcotics dealing by one Ronald Brandt. (This application was denominated CWT-55.) Later, as a result of this tap and other investigation, the officers sought a tap for Brandt's supplier, Richard Estrada. (This application was denominated CWT-56.) Thereafter, through a series of further surveillances, wire intercepts and applications for further wiretap authorizations, pursuant to A.R.S. § 13-1057, the "chain" involved in this suspected narcotics operation was uncovered.
The tap on Estrada lead directly to appellant Robles. Investigation of Robles lead to appellant Gonzales and ultimately lead to appellant Urias. All appellants raise a number of issues directed at the constitutionality of former A.R.S. § 13-1057, now § 13-3010, under both the fourth amendment and supremacy clauses of the United *284 States Constitution. They also argue that the wiretaps in this case failed to comply with congressional and state statutory requirements thus requiring suppression of all evidence obtained as a result of the taps. In addition, the following issues are raised by the parties, as indicated:
1. Whether there was sufficient evidence to support the conviction of appellants on all substantive counts.
2. Whether former A.R.S. § 13-1641 (precluding "double punishment") bars conviction of appellants for both the substantive offenses and the crime of conspiracy.
3. Whether the sentence imposed on appellant Urias was excessive.
STANDING
At the outset, we must dispose of appellants' claim that they all have standing to challenge all of the wiretaps authorized in this case because each tap was relied on, in part, to obtain further authorizations. Specifically, we find that none of these appellants have standing to attack the wire intercept authorized in CWT-55 (Brandt), and that only appellant Robles has standing to object to the wire intercept authorized pursuant to the original order in CWT-56 (Estrada).
Where defendants challenge evidence intercepted pursuant to a wiretap order on the grounds that the order was tainted by illegally seized evidence gathered pursuant to an earlier, unconstitutional or invalid order, they will fail where they were not parties to the intercepted calls and the intercepts did not occur on their premises. United States v. Civella, 648 F.2d 1167, 1172 (8th Cir.1981), cert. denied, 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1982) (quoting Alderman v. United States, 394 U.S. 165, 172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969)); United States v. Jabara, 618 F.2d 1319, 1326 (9th Cir.1980), cert. denied, 446 U.S. 987, 100 S.Ct. 2973, 64 L.Ed.2d 845 (1980); cf., United States v. Payner, 447 U.S. 727, 733-734, 100 S.Ct. 2439, 2445-2446, 65 L.Ed.2d 468, 475-476 (1980).
It is clear, on this record, that none of the appellants were intercepted on the Brandt tap, nor were any of them intercepted on the Estrada tap with the exception of appellant Robles. We will hereafter consider the sufficiency of the application and execution of the order authorizing the wiretap on Estrada along with the other challenges raised by appellants to the affidavits and orders to which they may properly object.
WHETHER THE WIRETAP APPLICATIONS AND EXECUTION OF THOSE WIRETAPS FAILED TO SATISFY STATUTORY REQUIREMENTS THUS REQUIRING SUPPRESSION
A. Minimization
Appellants argue that the evidence seized in these wiretaps must be excluded because the police officers failed to minimize their interceptions of non-pertinent calls as required by former A.R.S. § 13-1057(D)(6) (now § 13-3010(D)(6)). That section requires, as does the federal equivalent, that each order authorizing a wiretap shall specify that it be "conducted in such a way as to minimize interception of communications not otherwise subject to interception." The order complied with this requirement. Appellants, however, argue that the officers who executed the order failed to comply with the minimization requirement. They point to the following allegations as demonstrating a failure to minimize: there was no attempt to minimize conversations overheard that were in Spanish; personal calls between Gonzales and his wife were intercepted; 346 non-drug related calls were not minimized on the Gonzales tap; no written guidelines for terminating a call were implemented, and; each officer made his own determination as to the proper time to terminate.
The trial judge conducted an evidentiary hearing on this issue, found that sufficient minimization had occurred, and denied appellants' motion to suppress.
*285 In Scott v. United States, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), the Supreme Court articulated the appropriate standard to be applied in determining whether monitoring agents complied with the minimization requirements of Title III. The Court required an objective assessment of the reasonableness of the monitoring agents' actions in light of all of the facts and circumstances confronting them at the time. Three factors have been considered by many courts in determining the objective reasonableness of the minimization attempt. They are:
1. The nature and scope of the criminal investigation;
2. The government's reasonable expectations of the character of conversations; and
3. The extent of judicial supervision over the surveillance.
United States v. Feldman, 606 F.2d 673, 678 (6th Cir.1979), cert. denied, 445 U.S. 961, 100 S.Ct. 1648, 64 L.Ed.2d 236 (1979). See also United States v. Abascal, 564 F.2d 821, 827 (9th Cir.1977) (the standard of minimization is reasonableness), cert. denied, 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978). In Abascal, the court considered the following factors in determining the reasonableness of the minimization attempt in that case:
1. The duration of the wiretap;
2. The officers were investigating a large scale drug ring in which the existence but not the identity of co-conspirators was known;
3. Once a pattern of innocent calls was developed, those monitoring did not further record;
4. Conversing conspirators frequently discussed matters utilizing various types of "jargon" and code words.
We find that the evidence presented to the trial judge in this case clearly supported his conclusion that sufficient minimization had occurred. At the hearing, it was disclosed that the officers had terminated one tap after five days although the authorization was for a much longer period of time because the officers had determined that the objectives of that tap had been reached.[1] The orders authorizing the taps required reports to be filed with the judge every other day except weekends and at one time he visited the wire intercept room to observe the procedure being utilized. In addition, the court reviewed the total number of calls on the various taps and found that a high number had been terminated which tended to demonstrate attention to minimization requirements. For example, on the Gonzales tap there was a total of 2,657 calls intercepted of which 2,264 were terminated. The 346 "class 3", or non-pertinent calls, objected to by this appellant were considered by the officers to have been of such short duration or unclear content that it was necessary to record the entire conversation. On the Urias tap the officers intercepted 446 calls of which 367 were terminated. On the Estrada tap, there was a total of 340 calls, 267 of which dealt with narcotics. Sixteen were terminated. The officers also testified that when a pattern of innocent calls developed, they ceased monitoring those calls. Finally, the trial judge noted that there were no instances in which monitoring was done without recording the conversation.
Appellants' claim that conversations in Spanish were recorded in full by non-speaking Spanish officers is completely refuted by the record. Anticipating that there would be a high volume of Spanish language calls, the officers in this case utilized Spanish speaking officers not only from within their own department but from other agencies. It appears from the testimony at the evidentiary hearing that almost half of the monitoring officers spoke Spanish. The officers testified that it was not their procedure to simply record Spanish language calls in full and at a later time listen to them when Spanish speaking officers *286 were available. The trial court specifically addressed this objection by appellants and rejected their arguments. There was substantial evidence to show that no more than one call might have been recorded in its entirety because of the unavailability of a Spanish speaking officer.
Finally, the monitoring of the calls between appellant Gonzales and his spouse was reasonably explained at the hearing. Gonzales was the principal in the investigation, and it was reasonable to attempt to determine the nature of his activities. The officers legitimately anticipated that the extent of this appellant's participation in the drug conspiracy would be disclosed in these conversations.
When the interceptions in this case are reviewed in light of the extent of the conspiracy, the caution and suspicion exhibited by the conspirators, the constant judicial supervision at every stage, and the objective efforts made by the police to minimize, we find that the trial judge did not abuse his discretion in concluding that reasonable minimization requirements were met.
B. Sealing of the Tapes
The Robles, Gonzales, and Urias wiretaps were all terminated on August 2, 1978. Thereafter, on August 8, the inventory and tapes were sealed by the court. In addition, the tapes from the Estrada tap which had terminated on June 19, 1978, were also sealed at this time. Former A.R.S. § 13-1057(H), like the federal statute, requires that "immediately upon the expiration of the period of the order or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." Appellants argue that the late sealing, approximately eight days in the Robles, Gonzales, and Urias taps, and approximately 54 days in the Estrada tap required that the evidence seized pursuant to those taps be suppressed.
At the outset, we note that there was apparently some confusion in the trial court regarding the requirement of "immediate" sealing. There was argument presented that "immediate" meant within ten days after the expiration of the order authorizing the tap. That, clearly, is not what the statute provides. However, the federal circuit courts which have reviewed the sealing requirements of the federal counterpart, 18 U.S.C. § 2518(8)(a), although recognizing that the statute requires "immediate" sealing, have, nevertheless, denied requests for suppression of the evidence in many instances when lengthy delays have occurred.
In United States v. Diadone, 558 F.2d 775, 780 (5th Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1977), the court permitted the introduction of tapes not sealed until two weeks after the order expired. The court relied on the fact that a violation of the sealing requirement did not require suppression where there was no showing of prejudice to the defendants resulting from the delay and no showing that the integrity of the interceptions was in any way disturbed. Other circuits have followed this approach, requiring a showing of prejudice and a claim of tampering or that the integrity of the tapes has been affected by the delay before requiring suppression. See United States v. Falcone, 505 F.2d 478, 484 (3rd Cir.1974), cert. denied, 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1974) (holding that where the trial court finds the integrity of the tapes to be undisturbed, a delay in sealing is not, in and of itself, sufficient reason to suppress the evidence obtained); United States v. Lawson, 545 F.2d 557, 564 (7th Cir.1975) (upholding trial court's refusal to suppress tapes which were not sealed until 57 days after the order expired because the defendants did not question the integrity of the tapes).
It is clear that a seal need only be affixed after the authorization has expired or the tap has been terminated by the police. United States v. Fury, 554 F.2d 522, 533 (2nd Cir.1977), cert. denied, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977). In this case, the tapes from the Robles, Gonzales, and Urias taps should *287 have been sealed on August 2, 1978. However, they were not sealed until approximately August 8, 1978. The tapes from the Estrada tap were not sealed until more than 50 days following the termination of the tap by the police. Under the facts of this case however, we find that the trial judge was correct in denying the request to suppress the tapes because of the late seal.
Initially, we note our agreement with the observation of Division Two of this court in State v. Politte, 136 Ariz. 117, 664 P.2d 661 (App. 1982) in which the court stated:
It is obvious that the sealing and custody provisions have as their purpose the preservation of the materials in order to prevent alterations. This is not a requirement which "directly and substantially implement[s] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigating device." United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).
664 P.2d at 669.
We agree with those federal circuits which do not require the suppression of the tapes for late sealing where there is no showing of prejudice, tampering with the tapes, or that the integrity of the tapes has been affected by the failure to "immediately" seal the tapes. At a hearing conducted before the trial court, defense counsel specifically stated that there was no suggestion that the integrity of the tapes had been affected by the late sealing. In addition, the trial judge indicated by his ruling that the admissibility of the tapes would be conditioned upon a showing that no tampering had occurred and that their integrity was preserved.
At the time this case was submitted to the trial court on the basis of stipulated evidence for determination of guilt or innocence, the parties entered into written stipulations. We note that the parties expressly stipulated as to the accuracy, completeness, and integrity of the tapes which precludes any argument that the trial judge should have ruled differently in these issues. Because there was no prejudice shown or allegation made that the tapes lacked integrity or had been tampered with, we believe the trial judge's ruling refusing to suppress the tapes based on the late sealing was appropriate.

SUFFICIENCY OF THE APPLICATIONS IN SUPPORT OF WIRETAP AUTHORIZATIONS
Appellants argue that the applications for the Estrada, Robles, Gonzales, and Urias wiretaps were defective in several particulars. They argue that the affidavits in support of the applications did not set forth sufficient probable cause for the issuance of the authorization and did not properly allege that normal investigative procedures had been exhausted. Appellants argued further that the extended duration of the Estrada tap was unlawful and, finally, that the applications for additional wiretap authorizations were presented by illegal amendments to CWT-56.
A. Amendments to CWT-56
Appellants correctly point out that former A.R.S. § 13-1057 does not provide any procedure for amending a wiretap authorization to provide for new persons or telephone numbers to be intercepted. In this case the original wiretap under CWT-56 was obtained for the residence of Richard Estrada. Subsequent applications for additional wiretap authorizations were presented to the trial court in conformance with the statutory requirements in both former A.R.S. § 13-1057 and 18 U.S.C. § 2518(1) for appellants Robles, Gonzales, and Urias. However, the applications supported by appropriate affidavit were entitled "amendments" to CWT-56, i.e. the Robles tap was applied for as amendment 1; Gonzales as amendment 2; and Urias as amendment 3.
We reject any argument that the mere labeling of these applications as "amendments" affects their validity under former A.R.S. § 13-1057. Clearly, the applications and supporting affidavits were in compliance with the requirements of the *288 statute. Appellants' argument that the applications were invalid simply because they were labeled "amendments" is without merit.[2]
Finally, we note that appellants argued that even if these amendments were interpreted to be valid applications for new orders authorizing wiretaps they failed to comply with the requirement that "a full and complete statement of facts" of previous wiretaps be set forth. Former A.R.S. § 13-1057(B)(5). The simple answer to this objection is, as noted by the trial court, that there were no previous applications for taps on the same persons or places requested in the applications for Robles, Gonzales, and Urias. Therefore, no statement was required.
B. Sufficiency of the Affidavits' Disclosure of Necessity and Probable Cause for a Wiretap Order

The appellants argue that there was no compliance with former A.R.S. § 13-1057(B)(3), identical to 18 U.S.C. § 2518(1)(c), which required that an application for a wiretap include:
A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.
As noted in State v. Hale, 131 Ariz. 444, 447, 641 P.2d 1288, 1291 (1982), the necessity requirement is designed to prevent the use of a wiretap in situations where conventional investigative techniques would be adequate to uncover the crime. See also Politte, 664 P.2d at 670. Wiretaps are not to be used routinely as the first step in criminal investigations. Hale, 641 P.2d at 1291. However, the necessity requirement is to be interpreted in a common sense fashion with an eye toward the practicalities of investigative work. The judge who authorizes a wiretap has considerable discretion to determine whether an adequate showing of necessity has been made. United States v. Martin, 599 F.2d 880, 887 (9th Cir.1979); see also Hale, 641 P.2d at 1291. Of course, in order to satisfy the necessity requirement, the affidavit supporting the application must state facts from which the judge can make this necessary determination. Conclusionary statements are not sufficient. Hale, 641 P.2d at 1291; Politte, 664 P.2d at 671.
We think the court's review of the affidavit in United States v. Turner, 528 F.2d 143, 152 (9th Cir.1975), cert. denied, 423 U.S. 996, 96 S.Ct. 426, 45 L.Ed.2d 371 (1975), provides some guidance as to the factors reviewed on appeal to determine the sufficiency of the showing made to the trial judge. In that case, the court observed:
[T]he affidavits in support of the applications stated that Ethridge was suspicious of being followed by law-enforcement officers; that the Kinglet drive and Blue Heights residences were located on single-lane roads in mountainous areas, making undetected visual observations extremely difficult; that informants were unwilling to testify against Ethridge for fear of retaliation; that Ethridge's unwillingness to deal with strangers precluded undercover infiltration of his organization; that while agents had knowledge of Ethridge's involvement, they had been unable, by resort to normal investigative procedures, to obtain evidence to convict him and the other members of his organization.
In our judgment these affidavits provided that necessary "factual basis," see United States v. Kerrigan, 514 F.2d 35, 38 (9th Cir.1975), to indicate that the `practical and common sense' standard, S.Rep. No. 1097, supra, at 101, required under the statute was satisfied.
528 F.2d at 152.
We have reviewed each of the affidavits in support of the applications for the Estrada, Robles, Gonzales, and Urias wiretaps. *289 Each affidavit sets out the following information, to a greater or lesser extent, from which the trial judge could have determined the "necessity" of using the extraordinary technique of electronic surveillance: the use of undercover officers had limited utility because of their inability to be introduced beyond the very low-level echelon of the organization; infiltration was impossible by an undercover officer because of the reluctance of the group to introduce people not already known to individuals inside the organization; informants were unwilling to cooperate with police for fear of retaliation and were unwilling to testify; unsuccessful attempts at surveillance had been made  with facts being set forth showing the difficulty of surveillance because of the location of various residences and the suspicions of the people involved in the drug ring that they were being watched; the arrest of individuals would not be useful since they did not know other individuals except those with whom they had direct dealings; the normal investigative procedure of interviews had not been successful; information regarding the attempt to identify members in the organization had immediately been passed on to other members; search warrants would be of little use because it was not known where the drug supplies were kept, nor, in the experience of these narcotics officers, did drug dealers normally maintain detailed records regarding other people in the organization; no confidential informants existed who could reasonably be expected to penetrate the organization; the officers had overheard conversations wherein members of the organization had told others not to bring people to them and to change their routes of travel every time they came to make a pickup; grants of immunity would not be of assistance because of the fear of retaliation and the fact that members of this organization did not know other members except those with whom they directly dealt  this statement was supported by examples set forth in the affidavits, for instance, one dealer received a telephone call from Gonzales at the Robles residence, and not recognizing Gonzales attempted to sell him some heroin. The limited utility of a "pen register" which would only record the telephone number dialed was adequately set forth in the affidavits. Finally, the fears and suspicions of the suspects in this case that they were being watched, even to the extent that they were at times using other telephones, were also set forth in the affidavits.
It is clear, from each of the affidavits, that there was an attempt to set forth the "necessity" for the use of the extraordinary technique of wiretapping as to each of the appellants. The police officers, as a result of normal investigative techniques and information supplied by the previously authorized taps, had substantial reason to believe, at the time they requested the taps on Robles, Gonzales, and Urias, that each was in the middle of an extensive drug conspiracy with international dimensions. It was also clear that the conspirators used the telephone as the principle means of communication. Each of the appellant's activities and records showed him to be wary of surveillance and adept at avoiding it.
This was not a case of "boiler plate" allegations true of drug conspiracies in general and held not to be sufficient in United States v. Kalustian, 529 F.2d 585, 589 (9th Cir.1975). Here, the affidavits etched the nature and contours of this conspiracy and the extent of the investigation up to the requesting point of each affidavit with enough particularity to allow a judge to reasonably ascertain that continued use of normal investigative procedures probably would be fruitless. The wiretap orders were valid. Hale, 641 P.2d 1291; see also, United States v. Spagnuolo, 549 F.2d 705 (9th Cir.1977).
Next, the appellants argue that there was no showing of probable cause in the Robles and Gonzales applications to believe that "conversations would be intercepted" that pertained to a drug conspiracy. They argue that the affidavits failed "to provide a hint of probable cause to believe that Rivera/Robles used the telephone to obtain *290 narcotics from unknown dealers." Finally, they argue that there were no facts set forth in the affidavit in the Gonzales order that gave rise to probable cause to believe that Gonzales used his telephone to contact his supplier.
The probable cause showing to support the issuance of an order for a wiretap is not to be judged on a more rigorous scale than that ordinarily required for any other search warrant. Falcone, 505 F.2d at 481.
Each of the affidavits in support of the wiretap authorizations for Estrada, Robles, Gonzales, and Urias set forth information relating to conversations intercepted on previously authorized wiretaps which indicated that all of these individuals were involved in the unlawful distribution of heroin. The conversations intercepted by the taps and set forth in later affidavits amply demonstrate that each utilized his telephone from his premises to communicate with other alleged co-conspirators in furtherance of the conspiracy. In each affidavit, the officers clearly set forth the offense being investigated, the facilities or places from which interception was to occur, the types of communications to be intercepted, and the identity of the persons believed to be committing or about to commit one of the several enumerated offenses. This was sufficient to allow the trial judge to determine the existence of probable cause. United States v. Armocida, 515 F.2d 29, 35 (3rd Cir.1975), cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). The trial judge's determination of probable cause is supported by the record in this case. Absent an abuse of discretion his decision will not be reversed on appeal. Morrow v. State, 147 Ga. App. 395, 249 S.E.2d 110 (1978). There was no abuse of discretion in this case.
C. The Duration Of The Estrada Tap
Finally, appellant Robles contends that there was no showing supporting the extended duration of the tap on Estrada. The affidavit in support of the authorization for the Estrada tap detailed telephone contacts and methods of setting up narcotic deals so that it could reasonably be interpreted that Estrada was part of an organization distributing heroin. The tap on Estrada was authorized on June 9, 1978, and was terminated on June 19, 1978.
The authority to conduct an ongoing interception, granted under then A.R.S. § 13-1057(D)(5), does not require termination of the wiretap upon the receipt of the first related conversation, when there is probable cause to believe that there is a continuing offense, i.e. that there is probable cause to believe that there will be more than one relevant conversation. The type of offense under investigation is a factor to be considered in determining whether or not extended duration is appropriate. United States v. Cox, 462 F.2d 1293, 1303 (8th Cir.1972), cert. denied, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974). There were abundant facts set forth in the affidavit for the Estrada tap from which the trial judge could have determined that a narcotics organization was involved in a concerted attempt to distribute heroin in the south Phoenix area. His decision to grant extended authority was fully supported by the record.
WHETHER THE ARIZONA WIRETAP STATUTE, FORMER A.R.S. § 13-1057, VIOLATES THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION
Appellants argue that former A.R.S. § 13-1057 is violative of the fourth amendment because it vests discretion in the police officers executing the wiretap as to when that wiretap should be terminated. As a second ground supporting their argument, appellants contend that the statute fails to require victims to be presented with an inventory of the contents of the intercepted communications, i.e. that giving discretion to a trial judge as to what should be disclosed under the statute gives him the power to subvert the fourth amendment. We reject both arguments as have federal circuits which have addressed these precise *291 issues. Cf. United States v. Bobo, 477 F.2d 974, 981 (4th Cir.1973), cert. denied, 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 774 (1973).
In support of their position, appellants specifically rely upon United States v. Whitaker, 343 F. Supp. 358, 369 (ED.Pa. 1972), reversed 474 F.2d 1246 (3rd Cir.1973), cert. denied, 412 U.S. 953, 93 S.Ct. 3003, 37 L.Ed.2d 1006 (1973).
Both of appellants' challenges to our statute were addressed by the court in United States v. Cafero, 473 F.2d 489, 494 (3rd Cir.1973), cert. denied, 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1973). There, as here, the defendant relied on the lower court decision in United States v. Whitaker, 343 F. Supp. at 360, to support his argument that Title III was unconstitutional because it failed to restrict the executing officer's discretion by requiring a statement of specific objectives and requiring prompt notice after termination of the wiretap to those whose conversations had been intercepted. The court in Cafero held that by terminating authorized intercepts upon attainment of the objective, Title III makes it possible for courts to exclude evidence obtained through continuation after authorization terminates and that suppression remained the appropriate remedy when imprecisions reached constitutional magnitude in the warrants authorizing wiretaps. Finally, the Cafero court noted that it was a proper exercise of congressional power to vest discretionary authority in the trial judge to require further notice to parties not named in the wiretap authorization for purposes of inventory notice.
We agree with the analysis of the court in Cafero and reject appellants' claims that former A.R.S. § 13-1057 fails to comport with the requirements of the fourth amendment.
WHETHER THE ARIZONA WIRETAP STATUTE, FORMER A.R.S. § 13-1057, VIOLATES ARTICLE SIX OF THE UNITED STATES CONSTITUTION AND 18 U.S.C. § 2510, ET SEQ.
Appellants' final attack on the Arizona wiretap statute is based on an argument that the statute is invalid and unconstitutional because the federal government has preempted the field and any state statute purporting to authorize wiretap orders is invalid if it is "less restrictive" than the federal law. Appellants contend that the Arizona statute is less restrictive in at least four areas and is therefore unconstitutional.
Appellants assert that the following constitute disparities between the federal law found in 18 U.S.C. § 2510, et seq. and the Arizona statute:
1. 18 U.S.C. § 2518(9) sets forth an exclusionary rule applicable to all hearings and proceedings in which a wiretap was conducted in violation of statutes or the constitution, or where intercepted communications are not disclosed ten days prior to any hearing or proceeding. Arizona has adopted no comparable statute.
2. 18 U.S.C. § 2518(8)(a) and (c) requiring an immediate return of all recordings to the issuing court so that they may be sealed and authorizing contempt of any person who violates the restrictions on the execution of wiretap orders, have no Arizona counterparts in that; while the Arizona statute requires immediate sealing, the federal law goes on to state that an improper seal renders the contents of the intercepted communications and all derivative evidence inadmissible in all proceedings.
3. 18 U.S.C. § 2518(2) authorizing the issuing judge to require "additional testimony or documentary evidence in support of the application" prior to rendering a decision on the issuance of a wiretap order does not find comparable authority in Arizona; and, finally,
4. 18 U.S.C. 2518(3) providing that a justice may enter an ex parte order only within the territorial jurisdiction in which he is sitting finds no similar counterpart in Arizona.
We note that, with the exception of the last raised objection, the arguments set out by appellants have been recently addressed by Division Two of this court in State v. *292 Politte, 136 Ariz. 117, 664 P.2d 661 (App. 1982).
We agree with the analysis set forth in that opinion and reject appellants' claims that because our statute does not precisely track the language found in the specified federal code sections that it is constitutionally infirm. As noted by the court in United States v. Curreri, 388 F. Supp. 607 (D.Md. 1974), the fact that a state wiretap statute does not track the provisions of the federal statute does not preclude use of the evidence, where the evidence was obtained "in compliance with substantive provisions of federal statutes and constitutional requirements are complied with in fact." 388 F. Supp. at 613. Only a failure to abide by a portion of the act intended "to occupy a central or... functional, role in guarding against unwarranted use of wiretapping or electronic surveillance," will trigger the exclusionary rule. 388 F. Supp. at 613, quoting United States v. Chavez, 416 U.S. 562, 578-79, 94 S.Ct. 1849, 1857-58, 40 L.Ed.2d 380 (1974).
As noted by the court in Politte, 664 P.2d at 621, Arizona permits a motion to suppress evidence; allows the judge to take additional evidence to support the authorization of the interception; disclosure of communications is required pursuant to the Arizona Rules of Criminal Procedure; and grants the inherent power to cite for contempt. The lack of a specific exclusionary rule in the Arizona statute does not invalidate the wiretap laws because the federal exclusionary rule, 18 U.S.C. § 2515, is self-executing.
Finally, we reject appellants' argument that because the Arizona statute does not restrict the territorial jurisdiction in which the orders may be issued, as in 18 U.S.C. § 2518(3), that it is less restrictive than the federal statute. In 18 U.S.C. § 2516(2), the statute allows:
[T]he principle prosecuting attorney of any state, or the principle prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that state to make application to a state court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications, may apply to such judge for, and such judge may grant in conformity with § 2518 of this chapter and with the applicable state's statute an order authorizing or approving the interception of wire or oral communications....
We believe that this statute requires only that the state require that the persons authorized to apply for an order authorizing a wiretap make application to a "state court judge of competent jurisdiction" and that our enabling statute, former A.R.S. § 13-1057, allowing "any Justice of the Supreme Court, Judge of the Court of Appeals or Judge of the Superior Court" to issue an order authorizing a wiretap is in total compliance with the federal statute. A superior court judge in the State of Arizona is a state court judge of competent jurisdiction and there is only one superior court in Arizona. Ariz. Const. Art. 6, Sec. 13.
SUFFICIENCY OF THE EVIDENCE
Appellants were indicted on one count of conspiracy and a number of substantive counts. In the Statement Of Issues in the opening brief, they argued that the convictions of Urias and Gonzales on counts 21 and 38, respectively, should be reversed because there was no "direct evidence" establishing Urias' participation in the commission of any crimes alleged in the indictment prior to June 27, 1978, nor evidence of Gonzales' participation prior to June 16, 1978. Then, apparently in hindsight, it is suggested in the argument portion of the opening brief that as to Gonzales, counts 37 and 39 suffer from the same deficiency of "direct evidence". Next, the same claim is made as to counts 19 and 20 and counts 22 through 25 with respect to Urias. It is then argued that there was no "direct evidence" sufficient to support appellant Olea's conviction of count 53. Finally, Gonzales argues for the first time in the reply brief that his conviction on count 40 was not supported by sufficient evidence.
*293 We begin our review of the evidence mindful of the rule that on appeal from a conviction, a reviewing court considers the evidence in the light most favorable to sustaining the verdict. State v. Gracia, 121 Ariz. 417, 590 P.2d 1363 (1979). In addition, it is well settled that with limited exceptions inapplicable here, the commission of a substantive offense and a conspiracy to commit it are separate and distinct offenses. Gracia, 590 P.2d at 1366; State v. Garcia, 117 Ariz. 67, 570 P.2d 1080 (App. 1977) [co-conspirators are responsible for substantive offenses committed as a part of the conspiracy]. Furthermore, contrary to the implication in appellants' opening brief, it has been emphasized that a criminal conspiracy need not be proved by direct evidence and that a common scheme or plan may be inferred from circumstantial evidence. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Miranda-Uriarte, 649 F.2d 1345, 1352 (9th Cir.1981). Circumstantial evidence is clearly not inherently less probative than direct evidence. United States v. Green, 554 F.2d 372, 375 (9th Cir.1977). As noted by the United States Supreme Court in Glasser v. United States:
Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a "development and collection of circumstances." (citation omitted).
315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Moreover, the connection of a defendant to a conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt. United States v. Dunn, 564 F.2d 348, 357 (9th Cir.1977).
Assuming the admissibility of the evidence obtained through the wiretaps, appellants do not dispute the existence of a conspiracy; rather, they contend that their connection to the conspiracy was not established prior to certain dates, i.e. Gonzales, prior to June 16, 1978, and Urias, prior to June 27, 1978. They recognize the rule that co-conspirators are responsible for substantive crimes committed by co-conspirators in furtherance of the conspiracy but contend that there was no "direct evidence" demonstrating their participation in this conspiracy prior to their voices being overheard on court-authorized wiretaps.
At the outset, we note that the issue of guilt or innocence was submitted to the trial court based on stipulated evidence which included numerous police departmental reports, laboratory reports, excerpts from grand jury proceedings, surveillance logs, photographs, depositions, interviews of witnesses and well over five hundred transcribed telephone conversations between the co-conspirators obtained from taps on nine different telephone lines over a period of almost two months. These documents comprised hundreds of pages of exhibits. A tap on Urias' telephone was authorized on July 6 and terminated on August 2, 1978. Urias and Olea were clearly at the head of the distribution chain. A tap on appellant Gonzales' telephone at his business establishment and residence was authorized on June 26 and also terminated on August 2. The evidence demonstrated that Gonzales was the next step down in the distribution chain. Gonzales furnished the heroin he received from Urias and Olea to appellant Robles, aka "Wino", whose telephone was tapped on June 16th through August 2. Robles, in turn, provided the heroin he received from Gonzales to a number of pushers who sold for him  including Richard Estrada, aka "Huey", and Benny Rivera, aka "Flako." Huey's telephone had been tapped on June 9, terminating on June 19.
Given the volume of stipulated evidence and the alleged lack of "direct evidence", a thorough analysis and painstaking reference to portions of the record supporting the findings of guilt on the challenged counts were clearly required. However, the state's answering brief failed to properly address the issue. Instead, without citation to any case authority or the record, the state simply made a cavalier reference to the prosecutor's closing argument to support its contention that there was, "obviously", substantial evidence to support the *294 convictions. Although we have determined that the evidence is sufficient to affirm the convictions, we by no means found the conclusion "obvious" and have expended substantial time reviewing all of the stipulated evidence in order to properly consider the arguments presented by appellants. The evidence showed that the telephone contacts between Robles and Gonzales occurred immediately upon authorization of the wiretaps. The conversations were brief and the content was almost exclusively drug related which lead to a strong inference that the criminal liaison between these two persons already existed. Further, in early conversations between Urias and Gonzales, directions were made to handle the passing of money "like we do it all the time" and statements were made with reference to heroin from the shipment "this time" and that money was owed "from before". In addition, there was substantial circumstantial evidence that Robles was being supplied solely by Gonzales and there is direct evidence of Robles supplying heroin to the "pushers" involved in all substantive counts in the indictment.
Appellants also suggest that the evidence did not show that the sales by Estrada were in furtherance of the conspiracy because of a telephone call made by him on June 10, 1978, wherein he allegedly informed one of his dealers (Olono) that he bought from "other connections." We find that conclusion regarding the content of the conversation to be without merit. The conversation between Estrada and Olono dealt with the fact that Olono had been beaten up by two people he had sold heroin to and that the incident could possibly jeopardize Estrada's ability to obtain heroin in the future. We find nothing in that conversation which overcomes the evidence demonstrating that Estrada was, in fact, being supplied by and was selling for Robles. The evidence was more than sufficient to show that he was selling on behalf of Robles and "the organization."
Our review of the entire record leads us to the conclusion that there was sufficient evidence for the trier of fact to find that a conspiracy between all of the appellants existed prior to June 11, 1978, and sufficient evidence supporting each appellant's liability for all substantive crimes committed in furtherance of the conspiracy as alleged in the indictment.
DOUBLE PUNISHMENT
In order to sustain a conviction for conspiracy, it is essential that an overt act by one or more of the conspirators to effect the object of the conspiracy be alleged and proved. A.R.S. § 13-1003.
Appellants argue that the overt acts necessary to support a conviction for the crime of conspiracy in this case were the same acts as the substantive offenses for which they were charged, and under former A.R.S. § 13-1641, appellants could not be convicted of both conspiracy and the substantive counts.
Former A.R.S. § 13-1641 provides as follows:
An act or omission which is made punishable in different ways by different sections of the laws may be punished under either, but in no event under more than one. An acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other.[3]
Appellants recognize the rule that a conviction of conspiracy does not preclude the simultaneous conviction of the substantive crimes contemplated by the conspiracy. State v. Verive, 128 Ariz. 570, 627 P.2d 721 (App. 1981). Appellants contend, however, that although the same act may be charged in a conspiracy count and also charged and proved as the substantive *295 crime, the state is prohibited by A.R.S. § 13-1641 from obtaining convictions for both offenses where one single act encompasses elements of more than one crime. State v. Gracia, 590 P.2d at 1366. (The word "Punishment" as used in A.R.S. § 13-1641 includes both the conviction and the sentence imposed thereon.) In this regard, appellants argue that count one of the indictment, alleging conspiracy, contains twenty-four pages of overt acts later alleged to be in furtherance of the conspiracy and that all of the acts alleged to constitute the substantive counts in the indictment are also alleged as overt acts in count one.
An issue similar to that which appellants now raise was addressed by this court in Verive. There the defendant was convicted of both the crime of conspiracy to dissuade a witness and the crime of attempting to dissuade a witness. The defendant argued that A.R.S. § 13-1641 was violated because the state relied upon the same overt act to prove both the attempt and the conspiracy. The court stated:
If only one overt act were alleged in the conspiracy indictment, this same act could not be used to establish an essential element of any other charge. State v. Gracia, 121 Ariz. 417, 590 P.2d 1363 (1979). However, two overt acts were specifically alleged in support of the conspiracy charge ... either of these acts was sufficient to support the conspiracy charge; only one was required.
128 Ariz. at 579, 627 P.2d at 730.
Count one of the indictment in this case in fact alleges numerous overt acts, many of which do not involve all appellants. The requirement of an overt act as one of the elements of conspiracy does not mean that each individual charged with the crime of conspiracy must commit an overt act. Rather, the proof is sufficient if only one of the parties to a conspiracy commits an act toward the execution of the goal of the conspiracy. State v. Green, 116 Ariz. 587, 570 P.2d 755 (1977); State v. Aguirre, 27 Ariz. App. 637, 557 P.2d 569 (1976). Any one act by any one or more of the conspirators may be attributed to all of the members of the conspiracy. State v. Dupuy, 116 Ariz. 151, 568 P.2d 1049 (1977). Finally, while a number of overt acts were alleged in the indictment, the state was required to prove only one in furtherance of the conspiracy. State v. Verive, 627 P.2d at 730. We find no violation of A.R.S. § 13-1641.
URIAS' SENTENCE WAS NOT EXCESSIVE
Urias was sentenced to concurrent terms of not less than ten nor more than twenty years imprisonment on thirteen counts of offering to furnish a narcotic drug, two counts of furnishing a narcotic drug and two counts of furnishing a narcotic drug with a value greater than $250.00.[4] He argues that he should not have received a sentence greater than that received by co-defendants Robles and Gonzales who were sentenced to concurrent terms of five to twenty years on similar counts.
Based upon the evidence and the facts presented in the presentence report, the trial court determined that Urias' position of leadership in the narcotics ring, as well as his apparent lack of remorse, required a more severe sentence than that received by the co-defendants. The sentences imposed were clearly within the permissible statutory limits and we find no abuse of discretion.
CONCLUSION
For the foregoing reasons, the convictions and the sentences imposed are affirmed.
JACOBSON, C.J., and OGG, J., concur.
NOTES
[1] This occurred on the Rivera tap which was authorized at the same time as the tap on Robles.
[2] However, we do note that labeling an application as "amendments" might lead to the incorrect conclusion that tapes from previous, terminated taps in earlier "amendments" need not be sealed until the order expires on all amendments. See discussion under "Sealing", supra.
[3] This statute has been renumbered as A.R.S. § 13-116 and was amended effective October 1, 1978. Under the current statute an act or omission which is made punishable in different ways by different sections of the laws may be punished under both as long as the sentences imposed are made to run concurrently. Since the statute was amended subsequent to the commission of the crimes as alleged in the indictment, the former statute applies. State v. Mendivil, 121 Ariz. 600, 592 P.2d 1256 (1979).
[4] These were old code violations and the sentences were imposed pursuant to the statutes then in effect.